UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JACQUELINE GAINES,

  Plaintiff,

  v.

DENISE CROSS, *et al.*,

  Defendants.

Case No. 3:24-cv-187
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Chelsey M. Vascura

## OPINION AND ORDER

This matter is before the Court on a Motion to Dismiss for Failure to State a Claim filed Defendants Denise Cross and the Montgomery County Court of Common Pleas. (Mot., ECF No. 8.) Plaintiff Jacqueline Gaines opposed that Motion (Opp., ECF No. 10), and Defendants replied in support of the Motion (Reply, ECF No. 12). For the reasons below, Defendants' Motion to Dismiss (ECF No. 8) is **GRANTED**.

## BACKGROUND

This case arises out of Ms. Gaines's termination of employment as a magistrate with the Domestic Relations Court of the Montgomery County Court of Common Pleas. (Compl., ECF No. 1, ¶ 1.) She complains that she was deprived of her government employment in retaliation for exercising her First Amendment right to engage in protected speech. (*Id.* ¶¶ 1–2.)

 **I.** **Factual Background**

Denise Cross served as the administrative judge for the Montgomery County Court of Common Pleas, Domestic Relations Division. (*Id.* ¶ 7.) In 2011, she appointed Ms. Gaines to serve as a magistrate with the Domestic Relations Division. (*Id.* ¶ 9.) The duties of a magistrate included "presiding over legal hearings on behalf of the Judge, deciding cases, and mediating settlements, as well as performing related administrative functions." (*Id.* ¶ 10.)

1

After serving as a magistrate for several years, Ms. Gaines ran for a vacant judicial position with the Domestic Relations Division. (*Id.* ¶¶ 9, 12.) She declared her candidacy as a Republican in August 2023 and began campaigning for the Republican primary election scheduled for March 19, 2024. (*Id.* ¶¶ 12–13.) During her campaign, Ms. Gaines disseminated literature advocating for her candidacy. (*Id.*) Two pieces of campaign literature are relevant here and are displayed below.



(ECF No. 1-2, PageID 9.) In the above mailer, Ms. Gaines compared her work as a magistrate to that of her opponent, Jennifer Petrella, who also worked with Judge Cross and as a magistrate and court administrator. (*Id.*) The chart appears to suggest that Ms. Petrella, now Judge Petrella, had fewer responsibilities, and those responsibilities were inconsequential compared to her own. (*Id.*)

After serving as a magistrate for several years, Ms. Gaines ran for a vacant judicial position with the Domestic Relations Division. (*Id.* ¶¶ 9, 12.) She declared her candidacy as a Republican in August 2023 and began campaigning for the Republican primary election scheduled for March 19, 2024. (*Id.* ¶¶ 12–13.) During her campaign, Ms. Gaines disseminated literature advocating for her candidacy. (*Id.*) Two pieces of campaign literature are relevant here and are displayed below.



(ECF No. 1-2, PageID 9.) In the above mailer, Ms. Gaines compared her work as a magistrate to that of her opponent, Jennifer Petrella, who also worked with Judge Cross and as a magistrate and court administrator. (*Id.*) The chart appears to suggest that Ms. Petrella, now Judge Petrella, had fewer responsibilities, and those responsibilities were inconsequential compared to her own. (*Id.*)

The next campaign advertisement includes a statement urging voters to select Ms. Gaines over her opponent because Ms. Petrella did not have children. (ECF No. 1-3, PageID 10.)



(*Id.*) Judge Cross found the campaign literature offensive. When Ms. Gaines returned to work after she lost the Republican primary, Judge Cross met with her. (Compl., ¶¶ 15–16.) Judge Cross explained that she found Ms. Gaines's campaign literature to be offensive and that in distributing it, she had "violated the integrity of the Court" and placed the Court in a "negative light." (*Id.*) As a result, Judge Cross terminated her employment effective March 21, 2024. (*Id.* ¶¶ 16–17.)

**II.     Procedural Background**

Soon after Ms. Gaines filed her Complaint under 42 U.S.C. § 1983 for violations of her rights under First and Fourteenth Amendments of the United States Constitution. (Compl., ¶¶ 3, 20–21.) She brought her claim against the Montgomery County Court of Common Pleas and Judge

Cross in her official and individual capacities. (*Id.* ¶ 7.) Ms. Gaines alleges that terminating her from her position as magistrate because of her speech in support of her candidacy violated her right to free speech. (*Id.* ¶ 21.) She seeks an award of economic and non-economic damages, reinstatement to her position as magistrate, as well as an award of costs and attorneys' fees incurred in the prosecution of this matter. (*Id.* ¶ 3.) Defendants now move to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Mot.)

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for dismissing actions that fail to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To state a claim upon which relief may be granted, plaintiffs must satisfy the pleading requirements set forth in Rule 8(a). While Rule 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief," in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (clarifying plausibility standard from *Twombly*). Further, "[a]lthough for the purposes of a motion to dismiss [a court] must take all of the factual allegations in the complaint as true, [it is] not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly,* 550 U.S. at 555) (internal quotations omitted).

## ANALYSIS

Defendants argue that the Complaint should be dismissed because the Montgomery County Court of Common Pleas is not an entity that can be sued, and because Judge Cross is entitled to sovereign immunity in her official capacity and qualified immunity in her individual capacity.

4

Even if neither form of immunity applies to Judge Cross, Defendants argue Ms. Gaines failed to state a plausible violation of her First Amendment rights.

### I. The Montgomery County Court of Common Pleas is not a legally cognizable entity that can be sued.

Defendants move to dismiss the Montgomery County Court of Common Pleas because under Ohio law courts are not *sui juris*. (Mot., PageID 20–21.) Capacity to be sued in federal court is governed by Federal Rule of Civil Procedure 17(b), which says that "the law of the state where the court is located" determines the capacity of an entity to be sued. Fed. R. Civ. P. 17(b)(3). Ohio law provides that "[a]bsent express statutory authority, a court can neither sue nor be sued." *Malone v. Court of Common Pleas*, 344 N.E.2d 126, 128 (Ohio 1976) (quoting *State ex rel. Cleveland Mun. Court v. Cleveland City Council*, 296 N.E.2d 544, 546 (Ohio 1973)). Because a state court lacks an "independent legal existence," the proper defendants are the individual actors or the appropriate political subdivision, not the court itself. *Cooper v. Rapp*, No. 2:16-cv-00163, 2016 U.S. Dist. LEXIS 174938, at *21 (S.D. Ohio Dec. 19, 2016) (Marbley, J.), *aff'd*, 702 F. App'x 328, 329 (6th Cir. 2017).

Ms. Gaines concedes that the Montgomery County Court of Common Pleas is "not a legally cognizable entity with [the] capacity to be sued." (Opp., PageID 49, n.4.) Accordingly, the Court **GRANTS** Defendants' Motion and Ms. Gaines's claim against the Montgomery County Court of Common Pleas is **DISMISSED**.

### II. The Eleventh Amendment bars Ms. Gaines's claim against Judge Cross in her official capacity for monetary damages.

Since it is a jurisdiction question, the Court next addresses Defendants' argument that the Eleventh Amendment bars Ms. Gaines's § 1983 claim against Judge Cross in her official capacity. (Mot., PageID 31–33.) Defendants argue that Judge Cross is entitled to sovereign immunity under the Eleventh Amendment for Ms. Gaines's claims against her in her official capacity for monetary

5

relief. (*Id.*) Ms. Gaines counters that Judge Cross, as a judge of the Domestic Relations Division, is not an arm of the State entitled to sovereign immunity. (Opp., PageID 52–55.)

The Eleventh Amendment "bars all suits, whether for injunctive, declaratory, or monetary relief, against the state and its departments." *Thiokol Corp. v. Dep't of Treasury, Revenue Div.*, 987 F.2d 376, 381 (6th Cir. 1993). Because lawsuits against State officials in their official capacities are effectively lawsuits against the State itself, sovereign immunity also bars suits for damages against State officials in their official capacities. *Kentucky v. Graham*, 473 U.S. 159 (1985). State officials may, however, be sued in their official capacity for prospective injunctive or declaratory relief and in their personal capacity for damages. *Ex parte Young*, 209 U.S. 123 (1908) (finding that a federal court may enjoin a state official in their official capacity from violating federal law); *Hafer v. Melo*, 502 U.S. 21, 25–27 (1991) (holding the Eleventh Amendment does not bar suits for damages against State officials in their personal capacity).

For sovereign immunity to apply, Judge Cross must be a State official. The Sixth Circuit has held that an Ohio Court of Common Pleas is an arm of the State of Ohio and entitled to sovereign immunity. *Mumford v. Basinski*, 105 F.3d 264, 269 (6th Cir. 1997); *see also Laborers' Int'l Union, Loc. 860 v. Neff*, 29 F.4th 325, 331 (6th Cir. 2022). The subdivisions of the common pleas courts are "segments of state government" and part of a "unified state judicial system." *Laborers' Int'l Union,* 29 F.4th at 331 (describing the subdivisions of the court system as segments of state government). Because the State exercises "considerable control" over the courts, even though the "counties fund the court's day-to-day operations," the State court system, including its subdivisions, is considered an arm of the State. *Id.* (elaborating that the who pays the judgment inquiry is "not the sole criterion" of whether an actor is an arm of the State).

Courts within the Sixth Circuit have repeatedly reiterated the compelling reasons for treating all parts of the State court system as an arm of the State in federal-court litigation. *Smith*

6

*v. Grady*, 960 F. Supp. 2d 735, 752 (S.D. Ohio 2013) (Barrett, J.) (concluding Juvenile Court judge sued in their official capacity is an arm of the State for purposes of sovereign immunity); *Hoskins v. Hamilton Cty. Juv. Court*, No. 1:18-cv-305, 2019 U.S. Dist. LEXIS 135631, at *19 (S.D. Ohio Aug. 12, 2019) (Litkovitz, M.J.), *adopted by* 2019 U.S. Dist. LEXIS 148396 (S.D. Ohio Aug. 30, 2019) (Barrett, J.) (same). Because the domestic relations division of a county court is an arm of the state, so too are suits against its judges and magistrates. *Cikraji v. Messerman*, No. 1:13CV2059, 2014 U.S. Dist. LEXIS 90589, at *13–14 (N.D. Ohio June 30, 2014) (citing *Mumford*, 105 F.3d at 269). Ms. Gaines's arguments to the contrary contradict precedent and are unpersuasive.

Ms. Gaines's claim against Judge Cross in her official capacity for monetary damages is barred by the Eleventh Amendment. Defendants' Motion is **GRANTED** on these grounds. The Eleventh Amendment does not bar Ms. Gaines's claim against Judge Cross in her official capacity for prospective injunctive relief. But because the Court concludes that Ms. Gaines fails to state a plausible First Amendment violation, her Complaint must be dismissed.

### III. Ms. Gaines fails to state a plausible First Amendment claim against Judge Cross.

Defendants next argue that the Court should dismiss Ms. Gaines's claim against Judge Cross in her individual capacity because Judge Cross is entitled to qualified immunity. (Mot., PageID 21–31.) Even if Judge Cross were not entitled to qualified immunity, Defendants argue that she failed to state a claim for relief. (*Id.*) Because determining whether Judge Cross is entitled to qualified immunity necessarily overlaps with determining whether she has pled a plausible First Amendment claim, the Court will first address her constitutional claim under § 1983.

To prevail on a claim under § 1983, Ms. Gaines must prove that (1) she was denied a right secured by the Constitution; and (2) the deprivation was permitted by one acting under color of state law. *See Flagg Bros. v. Brooks*, 436 U.S. 149, 155–56 (1978). Neither party contests that

7

Judge Cross terminated Ms. Gaines while acting under color of state law, thus her claim turns on whether she was denied a right secured under the First and Fourteenth Amendments.

A First Amendment retaliation claim under § 1983 requires Ms. Gaines to show (1) that her speech was constitutionally protected, (2) she was subject to "adverse action or was deprived of some benefit," and (3) the protected speech was a "substantial" or "motivating factor" for the adverse action. *See Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 897 (6th Cir. 2001) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Defendants do not dispute that Ms. Gaines speech motivated her termination, or that she was subject to an adverse action. So the only question is whether her speech was constitutionally protected. The Court first discusses the applicable law, before applying it to Ms. Gaines's claim.

### A. The First Amendment does not prohibit the discharge of a policymaking public employee for speech related to her political or policy views.

The First Amendment, as incorporated by the Fourteenth Amendment, prohibits state governments and their political subdivisions from retaliating against most forms of citizen speech, including speech made by public employees about matters of public concern. *Westmoreland v. Sutherland*, 662 F.3d 714, 718–19 (6th Cir. 2011); *Connick v. Myers*, 461 U.S. 138, 140 (1983) (explaining that a public employee has a right to comment on matters of public concern without fear of reprisal from the government as her employer). But to establish that their speech is constitutionally protected, public employees face hurdles. Ms. Gaines must establish that (1) she was speaking as a private citizen, (2) on a matter of public concern, and (3) her interest in commenting on the matter outweighed the State's interest as an employer. *Westmoreland*, 662 F.3d at 719 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)).

Under the balancing requirement of the third element, the Court balances the interests of the employee as a citizen in commenting upon matters of public concern and the interest of the

State, as an employer, in promoting the efficiency of the public services it performs. *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1185 (6th Cir. 1995) (citing *Connick*, 461 U.S. at 140; *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968)). The government has a distinct interest in securing employees who will loyally implement the policies of its democratically elected officials. *Elrod v. Burns*, 427 U.S. 347, 367 (1976). As a result, while dismissals based on an individual's political affiliation are generally unconstitutional, the Supreme Court employs a different test if the public employee is in a policymaking or confidential position. *Rose v. Stephens*, 291 F.3d 917, 923 (6th Cir. 2002) ("*Rose* presumption").

Public employees who hold confidential or policymaking positions may be terminated for their political affiliation, or their actual speech, without violating the First Amendment. *Id.*; *see also Branti v. Finkel*, 445 U.S. 507 (1980) ("*Elrod/Branti* exception"). In other words, the balance favors the government where the discharge of a policymaking employee relates to her political views. *Rose*, 291 F.3d at 923. For the *Rose* presumption to apply, the plaintiff must (1) have held a policymaking position and (2) have spoken "on a matter related to political or policy views." *Dixon v. Univ. of Toledo*, 702 F.3d 269, 275 (6th Cir. 2012). Because the Court finds that Ms. Gaines held a policymaking position as magistrate and spoke on matters related to her political or policy views, the Court concludes that the *Rose* presumption applies.

B. **Ms. Gaines held a confidential policymaking position as magistrate.**

To determine whether a job constitutes a policymaking position, the ultimate inquiry is not whether a position may be appropriately labelled as involving "policymaking," but "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Lane v. City of Lafollette*, 490 F.3d 410, 419 (6th Cir. 2007) (quoting *Branti*, 445 U.S. at 518). The question is whether political affiliation is an *appropriate* requirement, not whether political affiliation is *essential* to effective performance.

*Rice v. Ohio Dept. of Transp.*, 14 F.3d 1133, 1142 (6th Cir. 1994) (*emphasis* added). The Court must "look beyond the mere job title and examine the inherent duties of the position[.]" *Peterson v. Dean*, 777 F.3d 334, 341–42 (6th Cir. 2015) (citing *Lane*, 490 F.3d at 419).

To assist with this analysis, the Sixth Circuit articulated four categories of government employment within the scope of this exception. *McCloud v. Testa*, 97 F.3d 1536, 1557 (6th Cir. 1996). The four *McCloud* categories are:

> (1) positions specifically named in relevant law to which discretionary authority in carrying out law enforcement or political policy is granted; (2) positions to which a significant amount of category-one authority has been delegated, or positions not specifically named by law but inherently possessing category-one type authority; (3) confidential advisors to category-one position-holders; or (4) positions that are part of a group of positions filled by balancing out political party representation or by balancing out selections made by different government bodies.

*Silberstein v. City of Dayton*, 440 F.3d 306, 319 (6th Cir. 2006) (citing *McCloud*, 97 F.3d at 1557). But an employee's position need not fit neatly into one of the four categories to be considered policymaking. *Feeney v. Shipley*, 164 F.3d 311, 318 (6th Cir. 1999). Any ambiguity with respect to whether the position falls into one of the four categories is construed in favor of the governmental defendants. *McCloud*, 97 F.3d at 1557 (citing *Rice*, 14 F.3d at 1140). Defendants bear the burden to show that Ms. Gaines held a policymaking position. *Branti*, 445 U.S. at 517.

Defendants argue that Ms. Gaines's role as magistrate should be classified as a category three position under *McCloud*. (Mot., PageID 25.) Defendants point to three cases to support their position. (*Id.*); *see also Mumford*, 105 F.3d at 272; *Birch v. Cuyahoga Cty. Prob. Court*, 392 F.3d 151, 160 (6th Cir. 2004) (citing *Dyer v. Radcliffe*, 169 F. Supp. 2d 770, 772 (S.D. Ohio 2001)); *Horen v. Cook*, 910 F. Supp. 2d 1025, 1029 (N.D. Ohio 2012).

In *Mumford*, the Sixth Circuit concluded that "[u]nquestionably, the inherent duties of an Ohio domestic relations court referee[1] entail a relationship of confidence between the referee and the judge(s) which he serves." 105 F.3d at 272. "The referee is privy to confidential litigation materials and internal court communications in the discharge of his duties, and . . . effectively makes policy for, or suggests policy to, the court on each occasion that he resolves a dispute in the court's name or recommends a disposition to a judge." *Id.* Therefore, "[t]he referee's political ideology, associations, and activities may rationally influence a judge's assessment of an individual's suitably for a position as his referee." *Id.*

Citing *Mumford*, the *Dyer* Court concluded that a juvenile court referee is a policymaking employee of the judge who appointed him. *Dyer*, 169 F. Supp. 2d at 774–75. Likewise in *Birch*, the Sixth Circuit explained that because the inherent duties of a magistrate in service of an Ohio domestic relations court involve policy making, so too do the duties of a magistrate in an Ohio probate court. *Birch*, 392 F.3d at 160.

Ms. Gaines counters that the cases above are distinguishable because they arise in the context of Title VII of the Civil Rights Act. (Opp. PageID 41.) But *Mumford* involved a § 1983 claim for First Amendment violations. And *Dyer* and *Birch* each rely on *Mumford* to conclude that the employee is a personal staff member under Title VII. Like the policymaking exception to First Amendment protections, a personal staff member of an elected official is not considered an employee entitled to the protections under Title VII. *See* 42 U.S.C. § 2000e(f). The tests for whether an employee is a policymaking employee or personal staff member both assess the closeness of the working relationship between the elected official and the employee. *See, e.g.*, *Schoonover v. Hamilton Cty.*, No. 1:22-cv-767, 2024 U.S. Dist. LEXIS 26586, at *19 (S.D. Ohio Feb. 15, 2024)

---

[1] Referees in Ohio Domestic Relations Courts have the same responsibilities as magistrates. *Birch*, 392 F.3d 159–60.

11

(McFarland, J.) (applying both the policymaking and personal staff tests). Since the tests are similar, and *Mumford* is on point, the Court is not persuaded by Ms. Gaines's attempt to distinguish the cases above.

Ms. Gaines next argues that it is too early to determine whether she held a confidential policymaking position within the scope of the *Elrod/Branti* exception. (Opp., PageID 40–42); *Branti v. Finkel*, 445 U.S. 507 (1980) (holding that public employees who hold confidential or policymaking positions may be terminated for their political affiliation, or their actual speech, without violating the First Amendment). But Ms. Gaines alleges that her duties as a magistrate included "presiding over legal hearings on behalf of the Judge, deciding cases, and mediating settlements, as well as performing related administrative functions." (Compl., ¶ 10.) In presiding over legal hearings and deciding cases, Ms. Gaines would have been "privy to confidential litigation materials and internal court communications[.]" *Mumford*, 105 F.3d at 272. She "resolve[d] dispute[s] in the court's name" and recommended dispositions to Judge Cross. *Id.* Given her tenure in the role, she had established a relationship of confidence and trust with the judges in the Domestic Relations Division. *Id.* Considering the relationship of trust, Ms. Gaines's "political ideology, associations, and activities may rationally influence [Judge Cross's] assessment of" her as a magistrate. *Id.*

Accordingly, Defendants have sufficiently shown that political affiliation is an appropriate requirement for the effective performance of the role of magistrate. Discovery will not change that. *Mumford* is directly on point. The Court concludes therefore that Ms. Gaines held a confidential policymaking position as a magistrate for the Domestic Relations Division of the Montgomery County Court of Common Pleas.

### C. Ms. Gaines's campaign literature included speech related to her policy views.

For Ms. Gaines to establish that her speech was constitutionally protected, and that Judge Cross violated her constitutional rights, she must establish that her interest in speaking outweighed the government's interests as an employer. *Westmoreland*, 662 F.3d at 718. The balance favors the government when an employee holds a policymaking position and speaks on a matter related to political or policy views. *See Rose*, 291 F.3d at 923. Since Ms. Gaines held a policymaking position, to avoid the application of the *Rose* presumption, Ms. Gaines must show that she was not speaking on matters related to her political or policy views. Because she cannot do so, the Court finds that the *Rose* presumption applies.

The *Elrod/Branti* exception has been construed broadly to apply to "political differences of any kind." *Simasko*, 417 F.3d at 564 (reasoning that an employee's decision to remain neutral during a campaign was a political difference and that terminating the employee did not violate the First Amendment). "A policymaking employee can be fired simply for supporting a political party different from that of his employer, even if that employee never evidences any policy disagreement with his employer." *Id.* That is because the government has a legitimate interest in securing employees who will loyally implement its policies. *Rose*, 291 F.3d at 922–23.

Put differently, the question is not just whether the employee's speech raises political differences, but whether the employee's speech could lead the employer not to trust the employee to loyally implement the employer's practices. *Latham v. Off. of the AG*, 395 F.3d 261, 266–67 (6th Cir. 2005). "As the Supreme Court has noted, 'while as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.'" *Id.* (quoting *Connick*, 461 U.S. at 149). Thus, when a policymaking employee "speaks in a manner that undermines the trust and confidence that are central to [her]

13

position," such an "overt act of disloyalty necessarily causes significant disruption in the working relationship between a confidential employee and [her] superiors." *Rose,* 291 F.3d at 923. Speaking on "job-related issues in a manner contrary to the position of [her] employer" is insubordination not entitled to First Amendment protection. *Id.*

Defendants argue that Ms. Gaines's campaign literature evidenced political differences with Judge Cross that undermined the trust and confidence central to her position. (Mot., PageID 27–29; Reply, PageID 64–66.) To support their position, Defendants cite *Marsilio v. Vigluicci*, 924 F. Supp. 2d 837, 844 (N.D. Ohio 2013). In that case, the plaintiff was an assistant prosecuting attorney appointed by the defendant, the elected prosecutor. *Id.* at 844–45. The plaintiff ran for county municipal judge and circulated an advertisement that said her opponent was a member of "the Good Ole Boys corruption club." *Id.* The elected prosecutor asked her to stop distributing the advertisement and to apologize to her opponent. *Id.* When she refused, she was terminated. *Id.*

The court explained that even though her refusal to apologize was not specifically job-related speech, her speech implicated loyalty concerns that could cause her employer to lose confidence in her. *Id.* at 853. As assistant county prosecutor, her allegation of a corruption, "a legally significant term, very plainly implicate[d] her loyalty to the elected officeholder whom she serves and relates to the performance of her duties[.]" *Id.* at 854. As a result, her "speech adversely affected a central aspect of her working relationship with defendant, and defendant's discharge did not violate the Constitution." *Id.* at 855.

Ms. Gaines argues that *Marsilio* is distinguishable because there the plaintiff's allegations of corruption were more serious and could not be verified. (Opp., PageID 45.) Such allegations are inherently different, says Ms. Gaines, than highlighting differences in qualifications for a particular role as she did here. (*Id.* PageID 45–46.)

14

Ms. Gaines's first piece of campaign literature compared her job responsibilities to that of her opponent. (ECF No. 1-2.) She explained that she handled 35 cases per week, compared to her opponent who as a court administrator only heard cases for a half-a-day each week. (*Id.* PageID 9.) She stated that her opponent spent most of her time on administrative duties like attending meetings and planning office parties. (*Id.*) In her second piece of literature, she posed the question to voters: "should someone without children of her own (my opponent), interview your children and decide their custody and visitation arrangements?" (ECF No. 1-3, PageID 10.)

The Court agrees that accusing one's opponent of being less qualified, as Ms. Gaines did here, is not equivalent to the corruption allegation in *Marsilio*. That said, criticizing how the Domestic Relations Division operated, including how Judge Cross delegated responsibilities to her court administrator, Ms. Petrella, were job-related policy statements that would make it more difficult for Judge Cross to trust Ms. Gaines to loyally implement her policies as an elected official. *Latham*, 395 F.3d at 266–67. At minimum, disparaging her co-workers for not having children could disrupt the working relationships within the Domestic Relations Division. *See Marsilio*, 924 F. Supp. 2d at 855.

The remaining cases relied upon by Ms. Gaines do not apply here. Ms. Gaines argues that "[m]uch closer to the facts of this case . . . is the case of *Scarbrough v. Morgan County Board of Education*, 470 F.3d 250 (6th Cir. 2006)." (*Id.* PageID 46.) In *Scarbrough*, a local news station reported that the plaintiff, the formerly elected school superintendent, who was seeking an appointment as county director of schools,[2] agreed to speak at a predominantly gay and lesbian Christian church. *Id.* at 253. The reporting was incorrect, the plaintiff had declined the engagement,

---

[2] The plaintiff was previously elected superintendent of Morgan County Schools but a change in Tennessee law eliminated the elected position of school superintendent and replaced it with the position of county school director, appointed by the local board of education. *Id.* at 253.

15

but stated that while he did not endorse homosexuality, he would not refuse to associate with gay people. *Id*. at 254. After that announcement, the school board refused to appoint the plaintiff as director of schools because he put the school's "stamp of approval" on homosexuality. *Id.* Plaintiff sued, the district court granted the school board's motion to dismiss, and the Sixth Circuit reversed. *Id.* at 263. The Sixth Circuit explained that the *Rose* presumption did not bar the plaintiff's First Amendment claim because his expression did "not directly implicate the loyalty requirements of his position" and could not be "characterized as insubordination." *Id.* at 258.

While *Scarbrough*, at first blush seems applicable, it is distinguishable for several reasons. The plaintiff's speech was not related to his government employment, and was directed to an audience separate from the workplace, and outside of work hours. *Id.* at 256–258. Ms. Gaines's speech, in comparison, involved content directly related to her government employment. (*See* ECF No. 1-2.) Further, the plaintiff's comments in *Scarbrough* did not criticize the school board or school district, as Ms. Gaines's campaign literature did in this case. Ms. Gaines criticized the Domestic Relations Division and suggested that her opponent worked less and had inconsequential job responsibilities compared to her own. (*See id*.) Since she effectively criticized Judge Cross for how she managed the Domestic Relations Division, her comments could be characterized insubordination, unlike in *Scarbrough*. (*Id.*)

Ms. Gaines also cites *Roupe v. Bay County*, 268 F. Supp. 2d 825, 827 (E.D. Mich. 2003). There, the plaintiff was fired from her position as chief deputy register of deeds after she answered questions posed by a county commissioner during a budget hearing about the county register of deeds' poor attendance. *Id.* The district court found that the plaintiff held a policymaking position but whether her speech addressed political or policy related issues presented a closer question. *Id.* at 832. Since a listener could have inferred that her comments about the register of deeds' absences

16

were neutral, the Court construed the facts for the plaintiff and found the plaintiff's statements were policy-free and non-critical. *Id.* at 833–34.

Ms. Gaines's campaign literature is not "non-critical" or "policy-free," like the statements made in *Roupe*. Her political or policy views are apparent from her accusations that her opponent is less qualified to serve as a judge on the Domestic Relations Division because she does not have children. (*See* ECF No. 1-3.) A listener might also understand from her campaign literature that Ms. Gaines was being critical of her employer, Judge Cross, for how she managed the Domestic Relations Division.

Ms. Gaines also relies on *Murphy v. Cockrell*, 505 F.3d 446 (6th Cir. 2007). (Opp., PageID 48.) While that case involved campaign speech critical of a co-worker, the Court concluded that the plaintiff was not in a confidential or policymaking position, and did not examine the *Rose* presumption. *See Murphy*, 50 F.3d at 453–55.

Defendants have carried their burden of showing that Ms. Gaines was a confidential policymaking employee who spoke on a matter related to her political or policy views. Ms. Gaines campaign speech related to her government employment and undermined the trust and confidence central to her policymaking position. The *Rose* presumption applies and tips the balance in favor of the government's interest in securing employees who will loyally implement its policies, over Ms. Gaines's free speech interests. This holding is a narrow one, based on the unique factual circumstances presented in this case and Ms. Gaines's role as confidential policymaking employee. Her speech interests were therefore not protected by the First Amendment, and Judge Cross did not violate her rights when she fired her as magistrate.

Ms. Gaines's § 1983 claim against Judge Cross is dependent upon her establishing that she was denied a right secured by the Constitution. (*See supra*, Part III.) Having found that her rights were not violated when she was terminated, the Court finds that Ms. Gaines has failed to state a

17

plausible claim for relief under § 1983. Therefore, her claim against Judge Cross in her individual capacity is **DISMISSED**. Since Defendants' actions did not violate the Constitution, the Court need not address whether Judge Cross is entitled to qualified immunity.

## CONCLUSION

For the reasons above, Defendants' Motion to Dismiss (ECF No. 8) is **GRANTED**. Plaintiff Jacqueline Gaines's § 1983 claim against the Montgomery County Court of Common Pleas is **DISMISSED**. Her § 1983 claims against Denise Cross in her individual and official capacities are also **DISMISSED** as barred by the Eleventh Amendment and for failing to state a claim upon which relief may be granted.

The Clerk is directed to enter judgment and close this case.

**IT IS SO ORDERED.**

**3/18/2025**　　　　　　　　　　　　　　　**s/Edmund A. Sargus, Jr.**
**DATE**　　　　　　　　　　　　　　　　　**EDMUND A. SARGUS, JR.**
　　　　　　　　　　　　　　　　　　　　　**UNITED STATES DISTRICT JUDGE**

18